Good morning, everyone. We will start with a group of three cases, INSTITUT PASTEUR against REA. Numbers 12, 14, 85, 86, and 87. Mr. Jenkins, as you proceed, you will explain to us whether all of your arguments are common to all three cases and where they diverge. MR. JENKINS Yes, Your Honor. I will attempt to do that. May it please the Court, prior to Pasteur's invention in these cases, no one had been able to make targeted modifications to genes in living cells. This was a long-felt need in the industry. The old reference, as an example, said that such a development would be a great advance. No one had been able to achieve it, certainly not to prior art cited by the PTO and Precision. Pasteur's inventors were able to make this development by using what is known as a Group I intron-encoded endonuclease, which is quite a mouthful, and I probably will get it mixed up more than once today. But these are endonucleases, a very unusual type of endonuclease that are very specific, and they do not cleave. They cleave only very rarely. The Pasteur inventors discovered these endonucleases about 20 years before they filed this patent application. They discovered them in the mitochondria of yeast. Is this part of the problem, that a good deal of this was in the prior art, whether produced by Pasteur or by others? Some of Pasteur's developments were in the prior art. Pasteur had certainly identified the endonucleases, had identified the sequences, had identified them as being capable of moving, responsible for moving introns in mitochondria. But the Pasteur inventors took a very methodical and rigorous approach to exploring these chemicals, and first they figured out what they were, and then they began to experiment with them in terms of how they could be used as tools. Yes, but to get right to the point of these applications, the office says, and pointed out, step by step and element by element, where a good deal of what is now being claimed had been published, perhaps by your scientists or others. But what had not been published by anyone was the ability of group 1 intron encoded endonucleases to cleave chromosomes in living cells without killing the cell. That had not been disclosed by Pasteur. Pasteur did not make that development until late in this 20-year process, and that is the subject of these patent applications. The idea that you can use this endonuclease to modify chromosomes in living cells, which is a very difficult thing to do, something that the art had tried to do, and to the extent that there is other prior art that has been relied on by the patent office here, it did not cleave the chromosomes. It cleaved bacteriophage, or it cleaved chromosomes that had been removed from the cell. But when you're talking about a living cell, and you're talking about taking the chromosome and cleaving it, that's a very risky thing to do. We have three separate patents, and there may, in fact, be three separate answers, and what you've just been talking about is, as I understand it, most clearly embodied in the 545, but I want to talk about the other two first, at least in my mind, maybe, to simplify and narrow the case to the 545. The 605. You agree that if the addition of the word chromosome, chromosomal, in Claim 14 was a substantive modification, that that claim is moot? I agree with that, Your Honor. Okay. And technically, if that claim is moot, what is the right disposition? Do we vacate the Board's decision with respect to Claim 14? Do we just dismiss the appeal with respect to that, or don't we? I think the proper decision is to vacate the Board's decision. And on the question of mootness, here, I guess, is my question. As I understand it, your argument that this was not a substantive change is that it was implicit in the reference to homologous recombination that it was a chromosomal DNA that in Claim 14 was being affected. And I guess I'm not sure why that's true, since there could be other DNA, even in the nucleus, in a plasmid or mitochondrial DNA, that is itself homologous to the chromosomal one, so that if you're doing the splicing on that non-chromosomal DNA, that would be covered by homologous recombination, so that when you added chromosomal, you actually were narrowing. Tell me what's wrong with that, thank you. Well, the mitochondria DNA is not in the nucleus. It's in a different organelle. Well, wherever it is. Claim doesn't talk about the nucleus, does it? I don't think so. No, but the claim talks about having a plasmid inserted in the cell that is homologous to the chromosome. And then it talks about there being homologous recombination. So the question is, why can't there be homologous recombination with DNA other than the chromosomal DNA? Well, because homologous recombination is, I mean, I guess the answer to your question is, theoretically, it's possible. But I think it is such a rare possibility that that's just an unfair reading of the claim. I think if you were going to read the claim in the context of the specification, in the context of the invention, when they're talking about putting a plasmid in the cell, and you're talking about putting the group 1 intron nucleate site into the chromosome, or into the chromosome, and then having homologous recombination, you're talking about homologous recombination with the chromosome. But even though you say it is rare, that it would be that way around. Excuse me? You say, in response to Judge Breyer, you said it would be rare, what he proposed. Yes, yes. But the fact that it's rare doesn't mean that it's not patentable. Well, I think that if it is so rare that that is an unreasonable reading of the claim, then I don't think that... Well, I think that you have to read the claim in the context of the specification, in the context of what's trying to be achieved here. The whole patent is about modifying genes, and how you do it is with homologous recombination, you're putting a plasmid in, and you have a plasmid that is homologous to chromosomal DNA. Implicit in that is that the DNA that you are going to be modifying is chromosomal DNA. What boils down to the broadest reasonable interpretation of the patent? Your Honor, that's a complicated question, because I think it does boil down to the broadest reasonable interpretation. When it was pending in the Patent Office, I think there is case law that says once the patent has expired, as these patents have, then broadest reasonable interpretation is no longer the proper way to interpret the claim. Can I come back to one point of response to Judge Barano's question? It was going to whether or not the 605 appeal was moot. I think he asked you whether we decided that the amendment had been subsumed, would we vacate or dismiss, and you said, well, you think we should vacate. Didn't we, and we have a similar situation with the 536 patent, appeal 1484. That appeal has already been dismissed as moot. Why would we treat this as moot? I think it could be handled either way. In either case, I think the patent will end up back at the Patent Office. So it could be dismissed, this appeal could also be dismissed. It would be consistent since we've already dismissed the 536. You're correct, Your Honor. Thank you. So the next one, which seems to me in order from – the next one, 252. The 252 just has something like the first step of this multi-step process that you were describing as the real advance, as the pastoral scientist captured ultimately in the more precise 545. Yes, Your Honor. Why is that not – even if the board was wrong about the 545, why was the board not right about the 252, which has so much less in it? Well, there has to be a reason. Let me back up. The claim claims a mammalian chromosome that has a group 1 intron-encoded nucleoside inserted into the mammalian chromosome. And the first question that has to be asked, I think, in the obviousness analysis is why would anybody be motivated to do that? Maybe it's possible. I mean, you can do a lot with genetic engineering these days. But why would you do it? It has no – there's no real purpose to it. There's no real function to it. There's no reason to do it other than if you're going to cleave it with a group 1 intron-encoded nuclease itself. Cleave it with the enzyme. Okay. And there was no – the concern about toxicity from cleaving the chromosomes is equally applicable to this claim to the chromosome as it is to the method. Because, again, if the expectation was that this would be toxic or if there's no reason to really think that you can benefit from putting the site into the chromosome, then why would you do it in the first place? So that's the first question. Why would you do it? Even if you were interested in trying to genetically modify a chromosome, why would you put a group 1 intron-endonuclease site into a mammalian chromosome? So this is a situation where – I don't know if this fits, but the 252 is kind of step 1 in a multi-step process with a tremendous payoff at the end of the process if it works. And you're saying there's really, really no reason to take step 1 unless you thought you had a likelihood of success after step 2 and 3. That's correct, John. The other point I would make is that we think that the site has to be more than just a sequence. It has to be a site that actually could be cleaved. It could actually function as a group 1 intron-encoded endonuclease site. And I think that there is uncertainty, unpredictability as to whether it would function. I don't think there's any question that you could put it in there. But would it function as a group 1 intron-encoded endonuclease site? Could it be cleaved? Mammalian chromosomes are very complex, very different than other types of chromosomes. Are they very much more complicated than the yeast chromosomes? I think they are, I think, 100 times or two orders of magnitude larger than yeast chromosomes, as an example. I think there are chemical differences between yeast and mammalian chromosomes. That issue was not fully developed below. I don't believe that the board or the patent office ever really made the argument that you're suggesting that, well, if you could do it in yeast, then can't you do it in mammals? But I think that the record does show that, at minimum, mammalian chromosomes are much larger than yeast chromosomes. It would help me, Mr. Jenkins, if you could focus on the mistake that the board made. You've been making your argument as to why you believe that the answer easily is non-obviousness here. But I know, for example, with the 545, you feel strongly that the board misunderstood Frey and Dujon when they were looking at the prior art. What's the prior art since we're on the 252? Where's the prior art mistake by the board on the 252? Well, I think one mistake is that the board did not interpret the endonuclease site as being a functional site. It basically ignored the evidence that we had put in relevant to that issue as to whether or not it would actually function. And I think that also is relevant to the motivation. And what happens if we agree with the board there and we reject your challenge on the functional site issue? What's that do to the rest of your argument? Well, I still think that if you're going to be combining elements of the prior art, as they're trying to do here, and they're saying basically you could take old says it would be desirable to put these or to be able to target mammalian chromosomes, and here you've got this group into one endonuclease site in Cork and Bell-Peterson, therefore it would be obvious to put them together. I don't think that that is consistent with Graham v. John Deere. I think that turns Graham v. John Deere on its head when you look at a reference that talks about long-felt need and then turns around in the patent office and that nobody's been able to achieve it and ends up saying that it looks like only... The only way to achieve it is on the 545 and the 605, right? Yes. And you're reading it back into the 252. I'm reading it back into the 252 for motivation as to why you would put a site or why there is no motivation to put a site. In your view, there's no useful purpose in life for the 252 unless you're going to go along to the 545, 605. That's correct, John. No function, no utility in the laboratory? Useless? No, I can't say absolutely. The knowledge that's conveyed by the 252 isn't worth the paper it's written on unless you have the 605 and the 545. That sounds odd. I think it could have some utility in the laboratory. I think it could be used for mapping is one possibility that you might be able to use a gene mapping. So it doesn't necessarily have to proceed to the other side. That's kind of what I thought Judge Toronto was aiming at in his earlier questions. But I think in order for... In terms of trying to ensure if you can tie the 545 and the 605 inextricably with the 252, then you've got some legs, some argument legs at least. But if there's independent viability and utility for the 252 out there in the real world, it seems to me that your necessary connection doesn't succeed. Well, it would still need to have the part to motivate you to put the site into the chromosome. Maybe someday we'll be able to do it. People have been trying for a long time. And other people have been trying to include the chromosome and keep the cell alive? Yes. They have been trying for a very long time. But the question is, what is there in old, in Perkinville-Petterson, or even in the Eddie-92 reference, that would motivate you to put this Group 1 endonuclease site into the mammalian chromosome? That's the question. And I don't think there's evidence in the board's opinion to support that. Can you tell us a little bit about your view, the board's, I think, your view, misanalysis of the secondary considerations on the 545 and, I guess, the 605? Yes. Am I right in thinking that the 545 and the 605 are sort of analyzed interior material? Yes. Okay, thank you. So, going back to... Secondary considerations on the 545. Yes, I think that the secondary considerations apply equally to the... What mistake did the board make in analyzing the secondary considerations on the 545? The first mistake they made was in rejecting the evidence, the licensing evidence. These patents have been licensed broadly in the industry, and the board rejected that evidence in part because it said that we didn't indicate that the licensees had obtained the license to obtain what was claimed in the patent, as opposed to what was disclosed in the patent. And everyone knows, well, I mean, the Johnson & Johnson case provides that if you, if something is disclosed and not claimed, it's not covered. So, you wouldn't, as a licensee, you wouldn't try to, you wouldn't take a license just to get something that was disclosed. I mean, clearly they were trying to get... You might make a mistake. Excuse me? You might make a mistake. Who might make a mistake? The person who's taking the license. They might read something in the disclosure in the patent that sounds very interesting to them, that really has nothing to do with what's claimed, and say, well, we'd like to have the license. You're assuming that people behave perfectly rationally and no one would ever take a license unless they were sure they had to.  I mean, if we don't assume that people are going to behave rationally, I don't know how you can apply, you know, the Graham versus John Deere objective evidence. So, you test the rationality by asking the person who took the license why did they take it. And you say, I took it because of that claimed subject matter, which is what I wanted. Your Honor, I... You know, there's a definition. I don't think that that... The law is required. I don't think that that type of specificity is required in order for the evidence to be considered and in order for it to be effective evidence of secondary considerations. Were these licenses for a substantial group of patents? Yes. For this family of patents, all related to the use of group one intron encoded in the nucleases to make targeted modifications to genes and living cells. They're all related to that in one way, shape, or form. But, you know, there's something mysterious about this exchange. It does seem throughout the entire record that this was recognized as an important scientific contribution and moving through the patent system of potential commercial significance. And I think we all appreciate that one wishes to keep one's commercial relationships private. It's very hard. I think I'll ask the office as well. The fact that confidentiality was claimed for these licenses seems to have led to some very curious speculation as to what might have been there that meant this or that. Can any sense be made of it? Did the board ask to see these licenses on a confidential basis, or did it just turn up in their final opinion that they were concerned at not having all the information that they thought was interesting? My understanding, Your Honor, is that they did not ask for that information. But it was just a concern that they raised in their decision. And so if for some reason we felt that it was significant and could affect the decision one way or another, they could be provided in confidence if need be? I think the answer to that is yes. I'm not asking for a commitment. I think the answer to that is yes. If I could go back to Judge Fleminger's question a moment or two ago about errors that the board made in considering a secondary consideration. The second error that I would like to focus on is the fact that the board dismissed a lot of the praise for the invention or the citations to the concept of using these groups in the nucleases to target chromosomes. Based on its belief that the Dujon 90 abstract disclosed what was being praised, that was based on what we believe is a misreading of the Dujon 90 reference. What these references were praising was the idea of being able to make genetic modifications, targeted modifications, to the chromosomes of the cell. The Dujon 90 reference describes inserting a group 1 nucleated site into a cell nucleus, but it does not say that that site was inserted into the chromosome. So it does not disclose chromosomal cleavage. It does not disclose targeted modifications of the chromosomes, which is... And the PTO agrees with you, I think, on that, doesn't it? Excuse me? The PTO, I think, agrees with you that the board misread the Dujon 90 reference? I believe they do. They said harmless error? Yes. They have argued that it was harmless error. We don't believe... It's got to be error if it's harmless, if they get the harmless error. Can I ask you a question about this? You said early on, consistent, I think, with at least what is it, Old and Eddy, that even before the relevant effective date here, the priority date here, it was recognized that it would be really quite desirable to be able to get to work what you've claimed at least in the 545. Yes, sir. If that's the case, even if there were some challenges and there was... Why is... What in the law of obviousness says, as you were describing early on, you proceed methodically, step by step, and then you try this. It works. It doesn't work. But the payoff is so tremendous, if it works, that it may not technically fall into the couple of sentences in KSR about obviousness to try, because maybe success wasn't anticipated. But the payoff is so great, there are publications saying this would be highly desirable. Why in the law of obviousness is this not... Is it not obvious for that reason? Well, Graham versus John Deere makes very clear that one of the most important pieces of objective evidence of non-obviousness is a long-felt need that has not been met. I don't think that you can... I mean, I guess there is some... To be fair, there is some conflict here, I guess, between what Graham versus John Deere says and what you are suggesting, which is that given the need, there was... People would have been highly motivated to try something. What about toxicity? Wasn't that one of the reasons why people weren't hanging back? Yes. I think that goes on to the second step, which is you have to have more than just motivation. You have to have a reasonable expectation of success. So even if there had been... Even if you said, because of the long-felt need, that there was this motivation to try it, you would have to have a reasonable expectation of success. And we don't think there was a reasonable expectation of success here because of the concerns about toxicity. Again, what you're doing is you're cleaving a chromosome. And the patent makes it very clear that if you cleave a chromosome and you don't do something else to... It doesn't repair itself somehow, then the cells are going to die. So it's an inherently risky approach to try and go about intentionally cutting the chromosome. And so I think that there was evidence of toxicity when the only time that... Other people in the laboratory were trying to achieve this cleaving the chromosome and keeping the cell alive and failing. Then why is it that Pasteur figured out how to make it work? Why is it? Yeah. I mean, it's not in the briefs, but I asked you earlier whether other people in the laboratory were trying, because they had a lot of these tools that maybe get you into the battered box and get you up and get you on first base and homes where you're trying to get. And people were trying and not succeeding, perhaps because of toxicity, right? Well, it wasn't just toxicity. The problem is, if you focus particularly on mammalian cells, the problem is that if you put genetic material into the cell that is homologous to a certain region, you're hoping it's going to match up with a certain region, it will integrate just randomly. It integrates all over. And then you have to find a way to identify the ones where it ended up in the right place, and that's the brute force method that Old talks about. What is particular about this invention that keeps it on the target? I mean, you're looking at cleaving out a place where you're trying to... You're putting an artificial site, cleavage site, into the chromosome first. That's what's in the 252 pattern. That's the landing site. That's the landing site. And the landing sites were... I mean, that was known for non-mammalian. Yeah. You can do that. So what's the new lab technique? You started saying about two minutes ago something about if you don't do something to something chemical and then you broke off the phrase. What is it that... The beauty of this invention is that there isn't anything extra you have to do. You end up cleaving the chromosome at only one site. It's just one cleaving because of the recognition site. That's the only place it cleaves. If you put it in other types of endonucleases, like a restriction enzyme, it'll just chop off the DNA all over the place. So what you end up doing is cleaving it only at one spot. And the cell is able to then take the additional DNA that you put in the cell and is able to repair itself with that additional DNA or the homologous DNA. And it doesn't die. Basically, that's why this invention works and it doesn't die. Because this endonuclease recognizes a very long sequence of bases. So it doesn't occur... What is it in the claims that keeps the cell alive? Keeping the cell alive, that's the fabulous thing that this invention does. People knew how to have a site. They knew how to put in chromosome DNA, right? But they couldn't keep the cell alive. Well, they couldn't keep the cell alive. And they couldn't target it. They couldn't cut the chromosome right where they wanted to. They couldn't make a single cut at a very precise location. Now, is the precise place of cutting claimed? Yes, that's the group one... That's the site. That's the group one intron encoded in the nuclease site. We need to hear from the office, but let me ask you one question. Is your general position that all of these patents rise and fall together? When you requested consolidation, you left that impression, but we have certainly become aware of differences. Yes. Well, I think they're all patentable for the same reasons. Okay. Let's hear from you. That's really not the answer. I mean, 605 has a movement issue. Yes, 605 has a movement issue, and the 252 patent, as you recognize, claims a site but doesn't... If we were to affirm the 252 decision, that is to say that the 252 is obvious, then you agree that the 605, if we reach it, and the 545 also fall? No. Well, that was Ken Honda's question. Well, not quite on the premise, but I have to... We'll explore this further with the office, and we'll see what their position is. But when you requested consolidation, it looked as if since they all arose from a common origin. We requested consolidation for the convenience of court. We thought they were sufficiently interrelated that it didn't make sense to repeat ourselves over and over and over. But there were distinctions between the methods. All right. Let's hear from Ms. Kelly. Good morning. May it please the Court. There is no dispute that at the time of the invention, persons of ordinary skill in the art knew how to insert a foreign gene into a eukaryotic chromosome using homologous recombination following a non-site-specific double-stranded DNA break. And then it wasn't being done? The science was in a very... Your Honor, Pasteur has admitted that those techniques were available and part of the state of the art. That's in the Stoddard Declaration as well. Pasteur Institute's argument repeatedly before the board and the agency was that their advance was to now be able to do the same thing in a site-specific manner by using a GIIE endonuclease to make a site-specific double-stranded DNA break, which would just by natural events be followed by homologous recombination as it had in the prior art following non-specific cuts. That sort of non-specific cut, those are the brute force techniques that are described in old, where you can end up with your site, your foreign gene being put into a non-specific site. You're telling us that these scientists and all the others that followed and all of the ensuing publications were just wasting their time? No, Your Honor. What I'm saying is their advance was now... Their alleged advance was the ability to now insert the gene rather than at random sites along the chromosome, but to insert it at a specific site in the chromosome. That's what they have alleged. You're saying that's what kept the cell alive? As far as keeping the cell alive... What's the answer to that? The insertion at that site, is that central to keeping the cell alive? Their claim isn't that their TIE and their claim for the USPTO is not that viability was the advance that they offered over the prior art. Their arguments with respect to viability are not, that's our great advancement. Their arguments with respect to viability are there would not have been a reasonable expectation of success if the claim didn't mention. That's where all of their viability arguments came in, was to say, yes, you know, Old says you could do this non-site-specific homologous, you know, insertion of a foreign gene using a double-stranded DNA break followed by homologous recombination. But that doesn't provide a reasonable expectation. I'm going to take Brian Dujan off the table. I read your brief to say that you agreed with Pasteur that the board misread Brian Dujan. No, Your Honor. Because you said it was harmless error. We most certainly did not say that. First of all, we said, the board never said that Fry taught... The board in one single sentence may have inadvertently said that Fry taught the cleavage of a yeast chromosome in a yeast cell and that that was an inadvertent error. Elsewhere in the board's decision, the board expressly found that Fry did a double-stranded DNA break using a GIID endonuclease in an isolated yeast chromosome. And you know that if you look to Fry... If you look to the board's decision regarding Fry, the board said that Fry... And it's in the brief. What is the site in the board decision? Okay. Is this going to be on the 5.5? A130. Huh? If you look at A130 in the 5.5, for fact-finding number seven, the board said... A130. A130, second full paragraph, second sentence, purified intact chromosomes from the resulting strain were digested with the GIID restriction of the nuclease SE1. Now, by using the word purified, the board is very expressly finding that that chromosome is no longer in the yeast cell, that that chromosome exists in an isolated manner. I guess the problem for me was that having quoted Fry there, the next page, the board seems to take the next step of understanding that to mean what is said in the insummative, which is the problem that I think it's 93 Fry does not say. And then the board relied in its ultimate analysis on the inference it drew from that quoted sentence. If you look to the very next page, you'll see that the board, in its own words, said that Fry and Duhon achieved cleavage of eukaryotic chromosomes. They don't follow it up by saying in yeast cells. I'm sorry, the first sentence, insum, each of Fry and Duhon 90 showed that a GIID endonuclease cleaved yeast chromosomal DNA when expressed in yeast cells. Is that? Yes, that was an inarticulate worded sentence. And what they were talking about was that the GIID endonuclease was expressed in the yeast cell. And they're talking about Duhon there. That sentence is the sentence that they're hanging this argument on. Whether it's inarticulate or whether it reflects an inadequate understanding of the science is really the question, isn't it? Well, that is the question. But the USPTOs argue here, as you know, we're arguing, that there are these other two findings of the board that don't make that, that are very clear that we're talking about an isolated chromosome, an isolated intact chromosome. And certainly the examiner's findings on this point are not an error. And the board did not say, oh, the examiner erred when the examiner made this finding. And your position on the Duhon 90 is that, if I understand it right, that that, I don't know if it's an abstract, I think, doesn't actually say which of the DNAs inside the cell it's affecting. Inside the nucleus is the gene. So that one can't, if one needed some affirmative reason to conclude that it was chromosomal DNA, that is not in fact found in Duhon 90. Not only is it not found in Duhon 90, Duhon 90 only speaks of a plasmid in the nucleus that's producing the GIIE endonuclease. It doesn't speak of a second plasmid with a GIIE recognition site. Yes, it's required by the claims of the 5-4 patent. And, you know, they point to the, in the requirement, they say, oh, well, you know, the Pleistos separation talks about how the Pleistos 1990 publication, in the GI, there was a second plasmid in those experiments, in the Pleistos 1990 publication, or, sorry, 1992 publication, where there's a second plasmid, the PTAR, some number, I can't remember, that had, there was a second plasmid in the nucleus and that had this GIIE endonuclease recognition site. But the Pleistos declaration never, in any way, shape, or form, says that this abstract that was presented at the MDO meeting, that there was any sort of second plasmid. And certainly, Duhon never speaks of a second plasmid. Duhon 90, and if you look, I just want to make one last point, if you look at the patents, they also refer to these studies but they never talk about a second plasmid. I'm sorry. No, no, that's fine. It seems to me that there were two separate points. One is, what did Duhon 90 itself teach? And I think it's not disputed any longer that you cannot infer from Duhon 90 that it was chromosomal DNA. A second point is whether now they have successfully shown, proved that in reality the experiment Duhon did and reported in the abstract was not that. I'm not sure that that second point is necessary for them to establish that there was error in the board's over-reading of Duhon 90, which on its face leaves it perfectly uncertain what DNA inside the cell was being altered. I agree with part of what your Honor said and part not. I agree that you cannot infer from Duhon 90, now that they've raised this argument, that you cannot infer with the preponderance of the evidence, one way or another, whether that artificial GI endonuclease recognition site was in a separate plasmid or in a separate chromosome. There are arguments favoring it either way. I respectfully disagree that the board said, oh, it definitely was in the chromosome, but we wouldn't even need that. Is that artificial site to form a reasonable expectation of success? Nothing we're doing here. We're arguing that reasonable expectation of success. If that second site was in a plasmid in an isolated yeast nucleus, it's telling us a lot of information. And the information it's telling us is that a GI NIE endonuclease will recognize its recognition site in the condition found in a yeast nucleus and still function. And that gets over some of their other arguments against a reasonable expectation of success. Namely, they say, well, the pH is different in a eukaryotic cell versus a prokaryotic cell. Well, presumably the pH in a yeast nucleus, an isolated yeast nucleus, is the same as a eukaryotic cell, and the GI IE endonuclease appears to recognize its recognition site at that pH and function. They knew that you needed the high pH for survival. All of this is what troubles me. It just seems to be so much retrospective. All right, you're delving into the unknown, and when you find something that works, well, sure. Well, if it wasn't unknown, this would be a novelty rejection. And we are 20 years out. The patents have expired. We're not talking about anticipation. We're talking about obviousness. Right. So in this pH world, I think that's a red herring. It's published that the pH of 9 to 10 is really what you need in order to proceed for survival. I don't know what citation Your Honor is referring to. I don't think the pH was tied into viability. Again, the viability issue was a rebuttal argument they made. When you were arguing pH to us, it seems to me like so much of this, in retrospect, it works very nicely if you're brilliant enough to put yourself in this loop and figure out what to do. But I'm troubled by the overall conclusion of retrospectively putting it together. Well, setting aside the retrospective aspect right now and just focusing on the pH, the argument in the brief is most fairly not about the pH isn't tied to viability. The pH is tied to whether the endonucleic can cut DNA at that pH, whether it will operate and function at that pH. Now, Dujan indicates that it will. And just the very fact that these GI endonucleases are isolated predominantly from the organelles of eukaryotic cells, they function and operate in their natural settings in the organelles of eukaryotic cells, it is somewhat ludicrous to believe that they would not function at the pH of the very cells that they have been isolated from. But again, that's not an argument about viability. That's an argument about whether the endonuclease will function in the eukaryotic cell. Can I ask you a question? Sure. The premise of the question I know you disagree with, but the premise of the question is that suppose I were to think that there's a problem here with the board's rejection of the 5-4-5, a problem either justifying reversal or vacate or remand. Explain why that conclusion should not equally require the same result from the 2-52. Why would an obvious misrejection of the 2-52 stand, even if I thought there was a problem with the 5-4-5? Because the claim is much different. All these arguments about viability and reasonable expectation of success, they fall by the wayside. And the secondary consideration evidence about licensing, that falls by the wayside as well. Those licenses were taken for, as they claim, these methods. The praise, all of that, relates to method steps about homologous recombination. At least the way that I was discussing it, and I think Judge Clevenger also with counsel for Pastor, was in terms of this idea that 2-52 is step one of a multi-step process, 5-4-5 and more, nobody reasonable would do step one unless they had a reasonable expectation of success of the second and third steps also. There's just no reason, no reasonable reason to do that. What's wrong with that? And if that's true, and if there truly isn't a reasonable expectation of success on the 5-4-5, why doesn't that, in fact, the inference that you would do the 2-52 step one anyway? It's not reasonable because that chromosome could be used as a laboratory tool. Just, for example, if you compare another endonuclease, a restriction endonuclease that also makes a double-stranded DNA cut in DNA, a double-stranded cut in DNA. Restriction endonucleases, their recognition sites have been put into eukaryotic chromosomes, including mammalian chromosomes, for research purposes. There are plenty of reasons you would want to put this recognition site into a chromosome for research purposes because it would allow you to do all sorts of subclone techniques and other techniques. Does that answer your other question? It just said, do you happen to remember in the 2-52 rejection, did the board rely on Frye and Dujon 90 or not? In the 2-52 rejection, the board relied on Old and Eddy to provide the reasonable expectation of success and not Frye and Dujon. Even if your honor believes that the board had erred with respect to Frye and Dujon 90, we assert that Old and Eddy would have provided a reasonable expectation of success. Again, the alleged advance over the prior art is this notion of making a site-specific cut using GII endonuclease. If Eddy had... Okay, I'm going to interrupt you while you're done. Okay. Eddy had already said you could use these GII endonucleases to make this sort of site-specific cut. You should be able to use that in a variety of organisms. And Old had already shown numerous techniques for performing insertion of a foreign gene with a monoculture recombination in a non-specific manner and said, hey, and by the way, here are several reasons why it would be great to do this in a site-specific manner. Now, Eddy was looking at restriction enzymes. They have a smaller recognition site, whereas the GII endonuclease has a larger recognition site. By random chance alone, you would expect that restriction... There would be more restriction endonuclease sites inherently found in the human genome versus the longer sites for the GII endonuclease. Laying the 252 to one side, if we were to disagree with you on the mootness issue on the 605, and therefore we had to greet the 103 rejection on the 605, do we treat the 605 and the 545 the same? For example, if we started our analysis on the 545 and decided that the board had errored and that the 545 is non-obvious, did we just come to the same conclusion on the 605? The 605 patent requires viability. Okay, but I'm just assuming if I'm basically worrying about the 103 analysis, it looked to me like essentially the same prior art was trotted out against the 605 as to the 545. But the claims in that instance are different. The board's decision was based upon these proposed amendments that can no longer be entered. So you would have to vacate that decision and have the board go back and decide what would happen if... What I'm saying is if the 605 appeal is not moot, which I know you think it is, but if it's not moot, then we have the 103 analysis in front of us. And I was having trouble finding any reason why I would reach a different conclusion under 103 on the 545 and the 605. Well, it seemed to me that they were both non-obvious. That was the way I looked at it. What distinguishes the 545 from the 605 in the 103 analysis? The distinction is the word viable and the word chromosomal. And that word, the word viable, was expressly written into the five precincts. Would you say if I decide both of those are not, those aren't substantive amendments? I know you're having a hard time getting over that, but that's the mootness argument. Well, the claims in the 536 patent did recite that limitation, and there's no inherency argument there. And those test chair voluntarily agreed to the mootness. I guess you don't want to answer my straight-up question, which is what's the difference on the pure 103 analysis between the 605 and the 545? Okay. Setting aside the procedural background... That was the premise of my question, ma'am, four minutes ago. My apologies for getting caught up with the procedural aspect. The reality is that the same teaching from the prior art would be used against those claims, but from a procedural standpoint, I think there's a problem. And unlike the 252, the board's decision on the 605, like the 545, does rely on Frye and Dujon 90. I mean, that's an assertion. I'm looking at it, so it's not really a question. Those references were used, and the examiner used them as well, to show what people of ordinary skill in the art knew with respect to the reasonable expectation of success. And in fact, Dujon 90 was originally raised by Hester Institute. That's how that got into the record. I see that my time is up. I just want to answer... You've used up most of your colleagues' time. Do you want to yield any? Yield the remainder to me, or continue? I did want to correct one factual error that opposing counsel made. Opposing counsel replied that restriction endonucleases just go in to cells and randomly chop them up to allege that Eddie has no bearing here. That's not true. Restriction endonucleases cut at a recognition site just like the GII endonucleases. Okay. Mr. Twyman, you have seven minutes. Good morning. Michael Toomey for Precision Biosciences. To answer the question quickly about whether they rise or fall together, 545 and 605 are basically claiming different aspects of the same invention. I would think that they're both obvious for the same reasons. Why they're really obvious in both cases is that the invention or the discovery here was a new method of promoting homologous recombination. Homologous recombination had been done in the heart before. It was low efficiency, not terribly effective. What was discovered was that these group 1 endonucleases, when they cut the site and create a double-strand break, create conditions which promote homologous recombination. When the DNA is broken, it needs to be fixed. To be fixed, a homologous sequence pairs up with it, provides a template for that to fix it. That's why it works. If that template has an inserted gene, something new, it gets copied in. That's what was recognized. That's what these things do in nature. The group 1 intron-encoded endonucleases are encoded in introns, intervening pieces of DNA. They copy themselves from genome to genome. When yeast mates, if one possessing the intron mates with one that doesn't possess the intron, the intron copies itself in. It causes a double-strand break, it provides its own DNA as a template to fix it, and it gets copied in. This was the insight that you see in much older Dujon papers from 1985 or so when these things were first discovered and can't have any bearing on the validity of this patent of prior art. What Bell-Peterson and Quirk showed was that these were capable, not just of promoting copying themselves, that you could use them to make the cut, but then provide a template with something else. That's what they show. In Quirk and Bell-Peterson, they insert a resistance gene. They use the group 1 intron-encoded endonuclease just to make the cut. The template provides a new piece of DNA that's inserted. That was a breakthrough. Very rapidly, you see a series of papers around that time. So you've got Quirk in 89, you've got Bell-Peterson in 90, you've got Eddy in 92, very important papers. Which one of those were in bacteria and which were not? Bell-Peterson and Quirk were in bacteria, and Eddy was in bacteria, and specifically suggest that you can now extrapolate this and do it in a variety of organisms. That's the phrase, it should be possible? Yes, it should be possible, and it should be because there's no reason it shouldn't be. That's not mere speculation. It should be possible because DNA is the same from bacteria up to man. So you're saying that any amateur can walk into the laboratory, take a system that has shown some promise in bacteria or yeast, and use it for mammals? It depends what technology you're talking about. If you're talking about restriction enzymes, yes. I'm really trying to understand this development which was received. A claim and recognition has apparently been followed and used commercially by others, including your client, presumably, and now we're told, oh, it doesn't matter. It was all there 20 years ago. If you look at the patterns carefully, you'll see that their title is something like nucleotide sequences encoding the enzyme ISKE-1 and uses it therefore. That's what the invention is in this pattern. They figured out how to express the ISKE-1 protein. All of their original claims are limited to ISKE-1. All the disclosures, read the summary of the invention. They found a new Group 1 intron-encoded endonuclease. Many, many years later, they started prosecuting claims covering the use of all Group 1 intron-encoded endonucleases to practice the methods developed by Bill Peterson or suggested by Eddie Fry. But we don't have any kind of written description rejection here, right? No. That says you went way beyond a specific set of molecules. No, we could not read that on re-exam, which is where this proceeding originated. But the art is there, and you can see it. The Fry paper is relevant because it's just one more bit of proof that shows these enzymes can cut chromosomal DNA. In Fry, it's not in vivo. That's true. They extracted the chromosomes in vitro. They tested it. It cut. And in fact, in Fry, they actually inserted a Group 1 intron recognition site into a yeast chromosome. So they inserted one into a eukaryotic chromosome, and they showed that it cut it. In isolation. In isolation. So we don't know if that, or rather, based on that alone, you can't infer that if you did that in the cell, the cell would live. Well, when you take the Group 1 intron-encoded endonuclease and express it in the nucleus as Duchenne did in 1990, they found that it could cleave DNA in the nucleus. Not chromosomal DNA, but it cleaved it in the nucleus. So the enzyme works in the nucleus. The enzyme can cut chromosomal DNA. It's hardly a stretch to put the two of them together and say you could cut chromosomal DNA in the nucleus. And Eddie said so. Eddie said, we can go insert landing sites, he called them, the recognition sites. We can insert these into the genomes of a variety of organisms and use these for genome engineering. So the suggestion is clearly there. He followed the roadmap that's set out in Bell-Peterson. He even says that in his paper. It's A9258 in the record. We've configured the experimental systems that closely mirror that used by Bell-Peterson. And this is essentially what's claimed in the pen. You would ask the question, Judge Klobuchar, what did they do to prevent the toxicity? How did they solve that problem? They didn't. There's nothing in the claim that solved the problem. In fact, if you use IT-1, one of these endonucleases, they're horribly toxic. It's not being used commercially. Most of them are still horribly toxic. You can't use them. There's one that's been commercially developed, IT-1, that's been modified and engineered to reduce the toxicity. Bell-Peterson and Quirk worked on it. They had a toxicity issue. And they lowered the expression levels of the protein to get it down. They used a low copy number plasmid. They used a wheat promoter. They used a system that turned it on and off with temperature so they could turn it on just when they wanted it to start cutting and not to cut too long. Did Bell-Peterson and Quirk use the IC-1? No, they used IT-1. Is there anything about the inventor's year selection of using IC-1 that, as you say, a bunch of other GLUT-1 intramarine-coated endonucleases, in fact, don't overcome the toxicity problem, but this one does? Yeah, IC-1 doesn't. It's not used commercially in vivo. But they used IC-1 in their patents. In their patents, they say that they used IC-1. They used IC-1 in a cell-based assay, yes. Not the IC-3-1. Not IC-3-1, no. They didn't have access to that, I don't think, at the time. The toxicity issue is another very interesting thing. We've got this question. Can these things cut chromosomes? Has that ever been shown? There seems to be this big issue about it. Because what causes the toxicity? These are enzymes that cut DNA. If they cut DNA in a cell at a high rate, the cell tries to repair it as best it can. If you express it at a high level, the cell can't keep up with the repairs. Its DNA gets chopped to pieces, and it dies. So the proof that this can cut chromosomal DNA is staring us all in the face. It's in the toxicity that they find in these papers and that they're trying to control. And on the one hand, Institute Pasteur is trying to say, well, we can do this in viable cells, and that's quite a difference because these things are toxic. But it's not clear they can cut chromosomal DNA. How does that make sense? The toxicity is from the cleavage of the DNA. That's set out in Dr. Bill Peterson's declaration. You can actually read it just in the court papers discussed, and we have it in the brief explaining what sections. They identified the problem. They thought they knew what it was. When they switched a low copy number of plasmids at a weaker promoter or a controlled promoter, the toxicity issue was managed. And when they needed to cut DNA, they turned it on with a temperature increase, and it worked. And it's great that it shows that it works. Thank you, Mr. Chalmers. Thank you. Mr. Jenkins, you have your microphone. Thank you, Your Honor. I think the idea that these few tidbits that are disclosed in the court from Bill Peterson and Kenny can somehow be combined and hold to reach the invention and that somehow people would have expected this to work is delivered maybe best by the Baldwin paper, which is one of the papers that we cited as showing that there had been long-tailed bee and unsuccessful efforts. This was a paper from 1992, so it was contemporaneous with the filing of patents. It was titled Targeted Homologous Recombination in Mammalian Cells. It's a review article from 1992 about trying to make targeted genetic modifications to mammalian cells. It doesn't mention group one intron encoded in the nucleases anywhere in it. No suggestion that, you know, somebody looking at the art, you know, as an objective scientist, there's no indication that he considered group one intron in the nucleases as something that could be used here. But most tellingly, he says, at A10757 of the paper, he comments after reviewing much of the literature that there has been essentially no progress in finding ways of significantly improving global targeting efficiency. That's exactly what these inventions do. They improve efficiency by letting you precisely cut and then have homologous recombination where you want it as opposed to having homologous recombination throughout the genome and have to search for it. That article is limited to mammalian... He was talking about mammalian cells. Does it cite articles like quirk or... No, it does not mention group one intron encoded in the nucleases at all. It wasn't on the radar screen. And not all of your claims are limited to mammalian. Not all the claims are limited to mammalian cells. That is true. Why do you suppose there wasn't any reference to group one? Well, I... Group one technology was known, right? I don't think they thought it could be used to modify the chromosomes of mammalian cells. It was known. I mean, the group one intron encoded in the nucleases had been known since at least 1985, when Dujan described them. The Quirk and Bell-Petterson paper was 1989, which according to precision is the critical insight here. But those were... They were not cleaving the chromosomes. They were cleaving the vectors that had been put into the bacterial cell. And so was Eddy. And Eddy, 92, does say... He has two statements in there that suggest that you should be able to use double-stranded breaks to promote amyloid recombination in a variety of organisms. Interestingly, the next sentence doesn't use the word should. It says, and it could be possible to use group one intron encoded in the nucleases, which, you know, itself is a speculative word as opposed to what he said in the previous sentence. But, you know, Eddy recognized that there would be a toxicity problem. He had to block the extra sites. And the other papers that we've cited show that there was a toxicity concern. And I think that Eddy has to be read in the context of all the art, which showed the concern about toxicity from group one intron encoded in the nucleases, which showed concern about cleaving chromosomes in general. And I think when you combine that with the lack of any evidence showing reasonable expectation of success because of the misreading of Dujon, Nyemi, and Frey and the secondary considerations, that claims that we have asserted here or that we raised here are not obvious. Okay. Thank you, Mr. Jenkins. Thank you, Ms. Cohen. Thank you, Mr. Conley. The case is taken under submission.